# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHRISTOPHER J. ALF,           :
                                  :
              Plaintiff,        :      Civil Action No.:    09-0802 (RMU)
                                  :
              v.                :      Re Document No.:   3
                                  :
MICHAEL B. DONLEY *et al.*,     :
                                  :
              Defendants.     :

## MEMORANDUM OPINION

### GRANTING THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## I. INTRODUCTION

This matter is before the court on the plaintiff's motion for a preliminary injunction. The plaintiff is the former CEO of National Air Cargo, Inc. ("NAC"), a transportation business that contracted with the Department of Defense ("DOD") to coordinate the delivery of military equipment, commercial goods, medical supplies and other freight for the Air Force. As a result of the events discussed below, the Air Force debarred the plaintiff from doing business with the government in July 2008. In response, the plaintiff brought suit claiming that his debarment violated the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* In addition, the plaintiff filed a motion for a preliminary injunction enjoining his debarment. Because the plaintiff has satisfied the criteria necessary for the issuance of a preliminary injunction, the court grants the plaintiff's motion.

## II. FACTUAL & PROCEDURAL BACKGROUND

The plaintiff is the founder and former CEO of NAC, "a 'freight forwarder' that relies on

a network of shippers, including air carriers and trucking companies, to deliver goods on its

behalf." Pl.'s Mot. at 2. As of May 2008, approximately ninety percent of NAC's shipments

were made on behalf of government clients. *Id.* at 43. In 1997, NAC entered into a contract with

the DOD to provide freight forwarding services for the DOD. *Id.* at 2-3; Defs.' Opp'n at 2.

In 2005, an NAC employee filed a *qui tam* complaint alleging that NAC had violated the

False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, by submitting inflated invoices to the DOD. Defs.'

Opp'n at 3. The DOD conducted an investigation into NAC's shipping and billing practices and

"uncovered considerable evidence of improper conduct" at NAC. *Id.* at 3-4. NAC ultimately

pleaded guilty to a one-count Information charging NAC with knowingly and willfully making a

material false statement to the DOD.[1] *Id.* Contemporaneously, NAC reached a global settlement

of the *qui tam* suit in which it denied any wrongdoing aside from the false statement underlying

the plea agreement. *Id.* at 5.

Following the guilty plea and civil settlement, the Air Force proposed that NAC, the

plaintiff and four other NAC employees be debarred on May 21, 2008, pursuant to the Federal

Acquisition Regulations ("FAR"), which govern the debarment of federal contractors. Pl.'s Mot.

at 3; Defs.' Opp'n at 5. The Air Force ultimately chose not to debar NAC, but debarred the

plaintiff on July 30, 2008. Pl.'s Mot. at 3; Defs.' Opp'n at 5-6. The initial notice of debarment

("the Initial Decision") imposed a period of debarment of ten years. Pl.'s Mot., Ex. 2 ("Initial

Decision"). In February 2009, the plaintiff administratively appealed the Initial Decision. Pl.'s

Mot. at 3-4; Defs.' Opp'n at 7. On April 17, 2009, the Air Force issued a letter ("the Amended

---

[1]     It is undisputed that the unknown NAC employee who made the false statement was not the
        plaintiff. *See* Pl.'s Mot. at 5.

Decision") upholding the plaintiff's debarment, but reducing the period of debarment from ten years to three years. *See* Pl.'s Mot., Ex. 6 ("Am. Decision").[2] Following the issuance of the Amended Decision, the plaintiff commenced this action and filed the instant motion. *See generally* Pl.'s Mot. The defendants opposed the motion on May 15, 2009, *see generally* Defs.' Opp'n, and filed the Administrative Record on May 19, 2009, *see* Notice (May 19, 2009).[3] The plaintiff filed a reply in support of his motion on May 22, 2009, *see generally* Pl.'s Reply, and with the plaintiff's consent, the defendants filed a sur-reply on June 8, 2009, *see generally* Defs.' Sur-Reply. The court turns now to the applicable legal standards and the parties' arguments.

## III.  ANALYSIS

### A.  Legal Standard for Injunctive Relief

This court may issue interim injunctive relief only when the movant demonstrates "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008) (citing *Munaf v. Geren*, 128 S. Ct. 2207, 2218-19 (2008)). It is particularly important for the movant to demonstrate a likelihood of success on the merits. *Cf. Benten v. Kessler*, 505

---

[2]  The Amended Decision was issued by the same debarring official who issued the Initial Decision.

[3]  The plaintiff's motion attaches and refers to several exhibits also contained in the Administrative Record. *See generally* Pl.'s Mot. The defendants cite to these exhibits as well. *See generally* Defs.' Opp'n. Neither party, however, cites directly to the Administrative Record, despite the fact that it was filed before briefing was complete – and, presumably, was compiled by the defendants in advance of that date. *See* Notice (May 19, 2009) (noting the filing of the Administrative Record); Pl.'s Reply; Defs.' Sur-Reply.

U.S. 1084, 1085 (1992) (per curiam).  Indeed, absent a "substantial indication" of likely success

on the merits, "there would be no justification for the court's intrusion into the ordinary

processes of administration and judicial review."  *Am. Bankers Ass'n v. Nat'l Credit Union

Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted).

The other critical factor in the injunctive relief analysis is irreparable injury.  A movant

must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 129

S. Ct. at 375 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)).  Indeed, if a party fails to

make a sufficient showing of irreparable injury, the court may deny the motion for injunctive

relief without considering the other factors.  *CityFed Fin. Corp. v. Office of Thrift Supervision*,

58 F.3d 738, 747 (D.C. Cir. 1986).  Provided the plaintiff demonstrates a likelihood of success

on the merits and of irreparable injury, the court "must balance the competing claims of injury

and must consider the effect on each party of the granting or withholding of the requested relief."

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987).  Finally, "courts of equity should pay

particular regard for the public consequences in employing the extraordinary remedy of

injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

As an extraordinary remedy, courts should grant such relief sparingly.  *Mazurek v.

Armstrong*, 520 U.S. 968, 972 (1997).  The Supreme Court has observed "that a preliminary

injunction is an extraordinary and drastic remedy, one that should not be granted unless the

movant, *by a clear showing*, carries the burden of persuasion."  *Id.*  Therefore, although the trial

court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted

lightly.  In addition, any injunction that the court issues must be carefully circumscribed and

"tailored to remedy the harm shown."  *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968,

4

977 (D.C. Cir. 1990).

## B.  The Plaintiff Is Entitled to Injunctive Relief

### 1.  Likelihood of Success on the Merits

The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review thereof."  5 U.S.C. § 702.  Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706; *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001).  Courts have interpreted this requirement to mean that the decision must be upheld unless it was not supported by substantial evidence.  *See, e.g.*, *Kisser v. Cisneros*, 14 F.3d 615, 619 (D.C. Cir. 1994).  In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations omitted).  At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made."  *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *Tourus Records*, 259 F.3d at 736.

As explained in the Initial and Amended Decisions, the plaintiff's debarment was based on two rationales.  First, the plaintiff "was debarred because his conduct as NAC's CEO and sole shareholder was of so serious or compelling a nature as to affect his present responsibility to be a Government contractor or subcontractor pursuant to FAR 9.406-2(c)."  Am. Decision at 7. Second, the debarring official concluded that "[a] separate and independent basis for [the plaintiff's] debarment rest[ed] on the imputation of NAC's criminal, fraudulent, and seriously

5

improper conduct to [the plaintiff]" under FAR 9.406-5(b). *Id.* For the reasons discussed below, the court concludes that there is a likelihood that each of these rationales was flawed.

### a. Present Responsibility

The debarring official's first rationale for the plaintiff's debarment was that the plaintiff's "conduct . . . was of so serious or compelling a nature as to affect his present responsibility to be a Government contractor or subcontractor pursuant to FAR 9.406-2(c)." Am. Decision at 7. In support of this conclusion, the debarring official explained that "[a]t a minimum, as NAC's CEO and sole-shareholder, [the plaintiff] failed to establish managerial, oversight and compliance capabilities such that unethical behavior either was not caught or was permitted." *Id.* More specifically, the debarring official determined that NAC engaged in a scheme to defraud the government by delivering freight late but billing the DOD as though the deliveries had been made on time. *Id.* at 1-2. To support this determination in the Initial Decision, the debarring official stated that the DOD conducted a "review of NAC records pertaining to approximately 6800 shipments between March and June 2001, and between January and March 2002," which "revealed that in approximately 2995 of those shipments, NAC delivered the freight late" but billed the DOD as though the freight had been delivered on time. Initial Decision ¶ 16.

In his administrative appeal, the plaintiff argued that this determination rested on a flawed factual and legal analysis. Pl.'s Mot. at 22-34. He contended that the data on which the debarring official relied to conclude that 2,995 of 6,800 shipments were delivered late omitted information necessary to determine whether the shipments were, in fact, delivered late. *Id.* Namely, the DOD's analysis of the majority of shipments failed to note whether the cargo was tendered after 5:00 p.m., whether the destination's receiving hours closed before 5:00 p.m.,

whether the delivery took place over a weekend or holiday and whether the shipment was

oversized.  *Id.* at 24.  Because all of these factors could extend the delivery deadline pursuant to

the applicable regulations and legal precedent, the plaintiff argued that the spreadsheet contained

insufficient evidence to conclude that the deliveries were late.  *Id.*

  In support of his administrative appeal, the plaintiff enlisted the assistance of retired

Colonel Glen Joerger, a former Air Force transportation executive, who conducted an

independent analysis of the DOD's statistics.  Pl.'s Mot., Ex. 11 ("Joerger Presentation").

Joerger concluded that the administrative record contained sufficient information to determine

whether only forty-five of the approximately 6,800 shipments in the DOD spreadsheet were

delivered late.  *Id.* at 3.  Out of those forty-five shipments, Joerger determined that forty-four

were in fact delivered on time or early.  *Id.* at 9.

  The debarring official acknowledged Joerger's findings in the Amended Decision, but

reaffirmed his determination that NAC had engaged in a pattern of delivering shipments late.

Am. Decision at 3, 5-6.  First, the debarring official asserted that

> the 45 shipments analyzed in the [post-debarment] [s]ubmissions played no role in
> [his] debarment decision.  The Memorandum [in support of the Initial Decision]
> makes no mention of them, and these shipments have no relevance to [his] findings
> as detailed in the Memorandum.  The Memorandum does, however, specifically
> mention the 2,995 out of 6,800 NAC shipments . . . that were delivered late . . . .  The
> [post-debarment] [s]ubmissions do not even mention these thousands of shipments.

*Id.* at 5.  As a result, the debarring official concluded that the forty-five shipments were irrelevant

to the decision to debar the plaintiff.  *Id.*

  In the alternative, "[a]ssuming for the sake of argument that the 45 shipments addressed

in the [plaintiff's post-debarment] [s]ubmissions were somehow relevant to the debarment

decision," the debarring official "decline[d] to draw th[e] inference" that "because at least 41[4] of [the forty-five] shipments were on-time, NAC's over-all on-time delivery record was similarly high." *Id.* The debarring official offered no explanation for his decision not to extrapolate the forty-five shipments across the 6,800 shipments in the DOD's spreadsheet, stating only that Joerger's assessment was "flawed and incomplete." *Id.*

The debarring official also concluded that the plaintiff had failed to "adequately support the argument that shipments designated for weekday delivery to installations where freight receiving operations closed prior to 5 p.m. automatically entitled NAC to an extra day to deliver." *Id.* The debarring official cited *Allstates Air Cargo, Inc. v. United States*, 42 Fed. Cl. 118 (1998), a decision in which the court noted that the carrier was required to provide notice to receiving facilities that closed before 5:00 p.m. Am. Decision at 5-6 n.4. The debarring official noted that "[t]he administrative record contain[ed] no evidence that NAC provided such notice" to the DOD, and concluded that "[i]t [was] possible to infer that, rather than try to meet the requested delivery date, NAC unilaterally granted itself extra time for these shipments." *Id.*

The plaintiff argues that the debarring official committed legal error by refusing, in light of Joerger's analysis, to reconsider his initial determination that NAC engaged in a pattern of late deliveries. Pl.'s Mot. at 25-26. The defendants do not address Joerger's analysis specifically. *See* Defs.' Opp'n at 12 n.3 (declining to address the plaintiff's arguments concerning the debarring official's consideration of specific evidence). Instead, the defendants assert generally that "[a]fter reviewing the administrative record in light of Plaintiff's post-debarment

---

[4]     In fact, Joerger's analysis concluded that although mistakes affected only forty-one of the forty-five shipments, Pl.'s Mot., Ex. 11 ("Joerger Presentation") at 3, forty-four of the shipments were delivered on time or early, or had "excusable delays," *id.* at 9.

submissions," the debarring official concluded that "the independent bases for Plaintiff's debarment continued to exist by a preponderance of the evidence, that Plaintiff failed to demonstrate his present responsibility for government contracting, as required by the FAR, and that a debarment was still necessary to protect the government's interests."  Defs.' Opp'n at 7. The defendants maintain that the debarring official properly concluded that the plaintiff failed to demonstrate his present responsibility under FAR 9.406-2(c) based on the improper shipping and billing practices that NAC admitted to in the global settlement of the *qui tam* suit and the False Statements charge.  *Id.* at 12.

Based on the materials submitted and arguments proffered at this stage of the proceedings, it appears that the decision to debar the plaintiff, as reflected in the Initial and Amended Decisions, was logically flawed.  As a preliminary matter, the debarring official appears to have misconstrued the import of Joerger's analysis.  The forty-five shipments addressed in that analysis represented a *subset* of the 2,995 allegedly late shipments listed in the DOD spreadsheet, rather than a separate group of shipments.  *Compare* Pl.'s Mot., Ex. 10 (listing a portion of the DOD spreadsheet) *with* Pl.'s Mot., Ex. 11 (analyzing the forty-five shipments for which complete information was included).  Thus, by asserting that those forty-five shipments "played no role in [his] debarment decision" and that the plaintiff "[did] not even mention [the] thousands of shipments" referenced in the Initial Decision, Am. Decision at 5, it appears that the debarring official failed to adequately consider the plaintiff's post-debarment submissions.

In addition, the debarring official provided no reasoned explanation for his refusal to conclude that the forty-five shipments analyzed by Joerger were representative of all of the shipments referenced in the DOD spreadsheet.  *See* Am. Decision at 5.  Furthermore, although

the debarring official questions whether NAC provided notice to the facilities that closed before 5:00 p.m., the Amended Decision fails to establish that NAC was obligated to provide such notice in order to be granted a one-day extension of the shipping deadline. *Id.* at 5-6 n.4. Moreover, the shipments that the plaintiff contends were miscategorized as late as a result of the fact that the destination closed before 5:00 p.m. are the only shipments addressed in the Amended Decision. *See generally* Am. Decision. The Amended Decision fails to address the other factors giving rise to the plaintiff's contention that the deadlines were miscalculated: whether the cargo was tendered after 5:00 p.m., whether the delivery took place over a weekend or holiday and whether the delivery was otherwise subject to an "excusable delay." *See generally id.*

As a result, it is likely that the plaintiff will successfully persuade the court that the debarring official failed to "articulate a rational connection between the facts found and the choice made." *Kisser*, 14 F.3d at 619 (citing *Bowman Transp. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285 (1974)); *see also Feinerman v. Bernardi*, 558 F. Supp. 36, 50 (D.D.C. 2008); *Canales v. Paulson*, 2007 WL 2071709, at *5-6 (D.D.C. July 16, 2007) (noting that a debarring official's failure to address mitigating factors presented by the plaintiff renders the decision arbitrary and capricious).

The allegedly late shipments were not the only basis for the debarment decision. *See generally* Initial Decision; Am. Decision. But this Circuit has "consistently held that when an agency relies on multiple grounds for its decision, some of which are invalid," the court may sustain the decision only if it concludes that the agency "would clearly have acted on [a valid] ground even if the [invalid ground] were unavailable." *Casino Airlines, Inc. v. Nat'l Transp.*

*Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006) (citations, quotations and alterations omitted).

Because the debarring official did not specify what weight he afforded the allegedly late

shipments, *see generally* Initial Decision; Am. Decision, the debarment decision will be subject

to reversal if the court ultimately concludes that the debarring official did not properly consider

Joerger's analysis. *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*,

358 F.3d 40, 44-45 (D.C. Cir. 2004) (noting that "[t]wo of the three reasons [the agency] gave . .

. would not support its decision, and we do not know – nor are we free to guess – what the

agency would have done" had it not entertained those rationales).

### b.  Imputation of NAC's Criminal Conduct

In support of a "separate and independent" rationale for debarring the plaintiff, the

debarring official concluded that, "[a]s the CEO and sole shareholder of NAC and as NAC's

point of contact for government business, NAC's criminal, fraudulent, and seriously improper

conduct [was] imputed to [the plaintiff pursuant to FAR 9.406-5(b)[5]] because [the plaintiff]

participated in, knew of, or had reason to know of NAC's criminal, fraudulent, and seriously

improper conduct."  Am. Decision at 7.  Relying on this Circuit's opinion in *Novicki v. Cook*,

946 F.2d 938 (D.C. Cir. 1991), the plaintiff argues that this determination was contrary to law.

Pl.'s Mot. at 18-22.  The defendants maintain that the plaintiff was properly debarred under FAR

9.406-5(b).  Defs.' Opp'n at 13.

The question before the *Novicki* court was what state of mind was required for an

---

[5]   FAR 9.406-5(b) establishes that "[t]he fraudulent, criminal, or other seriously improper conduct of a contractor may be imputed to any officer, director, shareholder, partner, employee, or other individual associated with the contractor who participated in, knew of, or had reason to know of the contractor's conduct."  48 C.F.R. § 9.406-5(b).

individual to be debarred under the "reason to know" prong of FAR 9.406-5(b).  *Novicki*, 946

F.2d at 941-43.  The Circuit concluded that "the drafters of section 9.406-5(b) intended [to apply]

. . . the accepted common law definition of 'reason to know,'" *id.* at 941 n.2, which provides that

> a person has reason to know a fact if he "has information from which a person of
> ordinary intelligence, or of the superior intelligence which such person may have,
> would infer that the fact in question exists or that there is such a substantial chance
> of its existence that, if exercising reasonable care with reference to the matter in
> question, his action would be predicated upon the assumption of its possible
> existence."

*Id.* at 941 (citing RESTATEMENT (SECOND) OF AGENCY § 9 cmt. d).  "The Restatement definition

of 'reason to know' imposes no duty of inquiry; it merely requires that a person draw reasonable

inferences from information already known to him."  *Novicki*, 946 F.2d at 941.  Thus, the

debarring official in *Novicki* erred by "characteriz[ing] the relevant inquiry as whether [the

plaintiff] was in such a responsible relationship to the misconduct as to have had the power to

prevent the misconduct by exercising the level of care and exertion that society would reasonably

expect from someone in his position" and concluding that, "by virtue of [the plaintiff's] status,"

the plaintiff had "reason to know" about the misconduct.  *Id.* at 941-42 (citations and alterations

omitted).  Because "reason to know" of the misconduct could not be inferred based on the

plaintiff's position alone, and because there was no evidence that the plaintiff had any

information from which a reasonable person would have inferred that misconduct was occurring,

the Circuit concluded that the plaintiff's debarment was improper.  *Id.* at 942-43.

It appears likely that the debarring official in this case committed the same error as the

debarring official in *Novicki*.  The debarring official concluded that, "[a]s the CEO and sole

shareholder of NAC and as NAC's point of contact for government business, NAC's criminal,

fraudulent, and seriously improper conduct [was] imputed to [the plaintiff pursuant to FAR 9.406-5(b)] because [the plaintiff] participated in, knew of, or had reason to know of NAC's criminal, fraudulent, and seriously improper conduct." Am. Decision at 7. Yet the Initial Decision and the Amended Decision fail to indicate that the debarring official concluded, based on specific information in the Administrative Record, that the plaintiff personally participated in the misconduct, had actual knowledge of the misconduct or had information from which a reasonable person could infer that misconduct occurred. *See generally* Initial Decision; Am. Decision. To the contrary, the debarring official explained that he based his determination on the plaintiff's status "[a]s the CEO and sole shareholder of NAC and as NAC's point of contact for government business." Am. Decision at 7. Because the debarring official failed to point to information that was in the plaintiff's possession from which he should have inferred that misconduct was occurring, the debarring official's determination on this issue likely violated *Novicki*. 946 F.2d at 941-43.

### 2. Irreparable Harm

In addition to the likelihood of success on the merits, a central consideration in determining whether to grant injunctive relief is the prospect of irreparable harm. *See Winter*, 129 S. Ct. at 375. The plaintiff maintains that he faces irreparable harm if his debarment is not vacated because his debarment renders him unable to work for NAC or to find comparable work. Pl.'s Mot. at 40-44. Moreover, the plaintiff argues that although lost income typically does not constitute irreparable harm, the economic harm that he is incurring is irreparable because, even if he prevails on the merits of this action, the defendants' sovereign immunity will prevent him from recovering damages. *Id.* at 41. In addition, the plaintiff asserts that the financial injury

NAC is incurring – signified by a fifty-five percent drop in total revenue during late 2008 – threatens the company's very existence.  *Id.* at 41-42.  Finally, the plaintiff claims that he is incurring irreparable harm in the form of damage to his future business prospects and professional reputation.  *Id.* at 42-43.

The defendants dispute the plaintiff's allegations concerning the harm that his debarment is causing to him and his company.  First, they contend that although the plaintiff's debarment prevents him from owning or operating another air carrier or doing any business with the government, "a wide universe of alternative employment and investment opportunities remain open to him."  Defs.' Opp'n at 16.  Moreover, the defendants point out that the plaintiff and his wife recently made a large philanthropic donation to the Women and Children's Hospital of Buffalo, a fact that, "[w]hile . . . unquestionably laudatory, . . . does not suggest that Plaintiff is on the brink of financial ruin."  *Id.* at 17 n.4.

In addition, the defendants observe that pursuant to an Administrative Agreement that NAC entered into with the Air Force to avoid debarment, the plaintiff removed himself from the company's day-to-day operations and placed his stock in NAC into a voting trust for a ten-year period.  *Id.* at 16.  As a result, the plaintiff would not be allowed to resume working for NAC even if his debarment were reversed.  *Id.*  The defendants next contend that NAC's drop in revenue during late 2008 is more likely a result of the fact that the company was proposed for debarment between May and July 2008, as opposed to being a product of the plaintiff's debarment.  *Id.* at 19.  Furthermore, the defendants maintain that the plaintiff has provided only speculation that NAC's $10.4 million loss in revenue threatens its existence.  *Id.* at 19-20.  Finally, the defendants argue that because reputational harm generally cannot give rise to

injunctive relief, the court should not consider the alleged damage being caused to the plaintiff by the stigma of his debarment. *Id.* at 20.

Because the test for injunctive relief is a flexible one, a court may issue injunctive relief upon "a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747. Thus, in light of the fact that the plaintiff has made a strong showing of likelihood of success on the merits, he need make only a relatively small showing of irreparable harm to be entitled to injunctive relief.

As an initial matter, a fifty-five percent reduction in NAC's revenue during late 2008 and the plaintiff's prediction that he "may not be able to keep NAC operational if it continues to sustain such large losses" are not sufficient to establish irreparable harm. *See Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d at 674 (noting that "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur"). The document filed in support of the defendants' sur-reply, which was filed under seal at NAC's request, further undermines the plaintiff's claim that NAC's ongoing viability is imminently at risk.

Turning next to the plaintiff's allegation of lost income as a result of his inability to work for NAC or obtain comparable employment, the defendants correctly observe that – as a result of the Administrative Agreement between NAC and the government – the plaintiff will be unable to resume working for NAC even if the court grants him injunctive relief. *See* Pl.'s Mot., Ex. 17 ("Pl.'s Supplemental Decl.") ¶ 6 (stating that "[u]nder the terms of the Administrative Agreeement [sic] imposed by [the debarring official] on NAC, [the plaintiff] cannot work for

NAC or even have contact with any of its employees").[6]  The plaintiff will, however, presumably

be able to seek out other government contracts if his debarment is lifted.  And by virtue of the

government's sovereign immunity, the plaintiff will be unable to recoup his lost income if he

remains unable to obtain other government contracts.  *Bowen v. Massachusetts*, 487 U.S. 879,

893-94 (1988) (noting that the APA does not waive the government's sovereign immunity for

money damages); *Feinerman*, 558 F. Supp. 2d at 51 (noting that "where, as here, the plaintiff in

question cannot recover damages from the defendant due to the defendant's sovereign immunity .

. . any loss of income suffered by a plaintiff is irreparable *per se*") (citations omitted); *cf.*

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (holding that "the temporary loss of income,

*ultimately to be recovered*, does not usually constitute irreparable injury") (emphasis added).

In addition, the plaintiff declares that he is "rapidly losing the benefit of the business

connections [he has] built over the past twenty years, as those connections lose trust in [him]

because of the stigma attached with [his] debarment and are forced to give their business to other

shippers."  Pl.'s Supplemental Decl. ¶ 7.  This declaration provides an additional indication of

irreparable harm.  *See, e.g.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (noting that the "plaintiffs have

demonstrated irreparable harm in damage to their business reputation"); 11A FED. PRAC. &

PROC. § 2948.1 (stating that "[i]njury to reputation or goodwill is not easily measurable in

---

[6]     The plaintiff posits that "[i]f this court finds that the debarment was arbitrary and capricious, then the court should also enjoin enforcement of the Administrative Agreement and the Voting Trust Agreement, which have no justification independent of the debarment."  Pl.'s Reply at 20. As the defendants argue in their sur-reply, the plaintiff's request – which was fully articulated for the first time in his reply in support of the preliminary injunction – is problematic because the Administrative Agreement and the Voting Trust Agreement were executed by NAC, which is not a party to this action.  Defs.' Sur-Reply at 3-5.  In any event, the court need not entertain the plaintiff's request at this juncture because its grant of the plaintiff's motion for a preliminary injunction rests only on a determination that it is *likely* that the plaintiff will prevail on the merits of his claim, not that the debarment was, in fact, arbitrary and capricious.

monetary terms, and so often is viewed as irreparable").

   As a result, the plaintiff has persuaded the court that his debarment is causing him some degree of irreparable harm.  In combination with the likelihood that he will succeed on the merits, the irreparable injury prong of the analysis entitles the plaintiff to injunctive relief.  *See Population Inst.*, 797 F.2d at 1078.[7]


## IV.  CONCLUSION

   For the foregoing reasons, the court grants the plaintiff's motion for a preliminary injunction.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 29th day of October, 2009.


                              RICARDO M. URBINA
                              United States District Judge

---

[7]   As with many requests for injunctive relief, the remaining two factors – the balancing of the equities and the public interest – are inextricably linked to the plaintiff's likelihood of success on the merits.  *See, e.g.*, *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998).  The defendants argue that the public interest militates against granting the plaintiff's motion because the government must be able to ensure that only reputable contractors obtain government contracts.  Defs.' Opp'n at 21-23.  Because the plaintiff has demonstrated a likelihood that he will prevail on the merits of his claim, however, the government's argument on this point carries little weight.